Filed 10/24/25  P. v. Calamba CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C100100 |
| Plaintiff and Respondent, | (Super. Ct. No. MANCRFE20210006292) |
| v. | |
| ALLENRAY CASTILLANO CALAMBA, | |
| Defendant and Appellant. | |

Defendant Allenray Castillano Calamba appeals from convictions arising out of a murder-suicide gone wrong.  Before shooting himself in the chest, he shot his ex-fiancée Valeria Garcia-Cruz, her brother Jesus Garcia-Cruz,[1] and her father.  A jury found him guilty of two counts of first degree murder and one count of attempted premeditated murder.  The jury also found true certain enhancements and special circumstances,

---

[1] Because they share a surname, we will refer to Valeria and Jesus by their first names. No disrespect is intended.

1

including enhancements for discharging a firearm and the special circumstance that Calamba committed the murders by lying in wait.

Calamba raises 10 claims on appeal: (1) jury instructions erroneously described the mental state required for first degree murder by means of lying in wait; (2) the attempted premeditated murder conviction is not supported by substantial evidence; (3) the attempted premeditated murder conviction must be set aside due to flaws in the jury's verdict form; (4) the lying-in-wait special circumstance findings were not supported by substantial evidence; (5) the first degree murder conviction regarding Jesus was not supported by substantial evidence; (6) jury instructions erroneously described murder "by means of" lying in wait as murder "while" lying in wait; (7) jury instructions violated his constitutional right to a unanimous verdict on the crime of first degree murder; (8) the trial court erred by instructing the jury that imperfect self-defense does not apply when the defendant, through his own wrongful conduct, created circumstances that justify an adversary's use of force; (9) jury instructions created an unconstitutional presumption of first degree murder; and (10) there are errors in the abstract of judgment.

We reject claims one through nine and agree with the parties that errors in the abstract of judgment must be corrected. We have also identified a mistake at sentencing that requires modification of the judgment. Accordingly, we will affirm the convictions, modify the judgment, and direct the trial court to amend the abstract of judgment.

BACKGROUND

One day in June 2021, Calamba shot and killed his ex-fiancée Valeria and her brother; Calamba also shot and wounded Valeria's father. Surveillance cameras in the mobile home park where the incident happened recorded Calamba about 20 minutes before the shooting as he parked his car a few streets from Valeria's home and walked the rest of the way. He was dressed in black and the hood of his jacket was over his head.

Just before 3:00 a.m. that morning, Valeria's family was awakened by rapid honking outside their home. Valeria's mother heard Valeria, who was outside, say,

2

"wait." Valeria's father, Juan Rojas, heard Valeria crying and telling someone in a scared voice "not to do it." When Rojas ran out of his bedroom toward the front door he saw his son Jesus, unarmed and wearing only shorts, also running to the front door. Jesus told his father to stay inside, but they both left the house. With the aid of outdoor lighting, the two men saw Calamba standing next to Valeria, who was seated at the wheel of a vehicle with the door open.

Jesus ran toward Calamba, and Calamba then moved backward toward the rear of Valeria's vehicle. Calamba fired gunshots in the direction of Jesus and Rojas. Four bullets fatally struck Jesus, who was about seven feet in front of Rojas.

Rojas sought cover behind a nearby truck. Rojas could not see Calamba as he hid, but he could hear Valeria crying. After about five to eight seconds, Rojas left his hiding spot because he saw his wife coming outside and he feared Calamba would harm her. Calamba then fired two shots at Rojas as he was running back to his home. Rojas felt a bullet enter his ankle as he reached his front door.

Once inside, Rojas heard Valeria scream, "stop." More gunshots rang out about 45 seconds later. Rojas then heard Calamba apologize to Valeria before the sound of one final gunshot; after fatally shooting Valeria, Calamba had intentionally shot himself in the chest.

Before driving to Valeria's home that night, Calamba wrote two letters to his family. In one, he apologized to his brother for leaving him all alone. In the other, he anticipated that his parents were "probably wondering why [he] did what [he] did," explained that he and Valeria had hurt each other, and assured his parents he would be "looking over" them "from the other side."

In a September 2023 amended information, Calamba was charged with two counts of murder (counts 1 and 2) and one count of attempted murder (count 3) and alleged, inter alia, a "special circumstance" that Calamba committed the murders by lying in wait

3

(Pen. Code, § 190.2, subd. (a)(15))[2] and that the attempted murder was willful, deliberate and premeditated (§ 664, subd. (a)).  After presenting his defense evidence at trial, Calamba moved for a judgment of acquittal (§ 1118.1)[3] on certain allegations in the amended information, including the "special circumstance" allegation that he committed the murders by lying in wait.  The trial court denied that motion, and later instructed the jury on the two distinct theories of first degree murder that the prosecutor proposed—(1) willful, deliberate, and premeditated murder and (2) murder committed while lying in wait or immediately thereafter—as well as second degree murder, voluntary manslaughter based on heat of passion and imperfect self-defense, and the complete defense of reasonable self-defense.

The jury found Calamba guilty on all counts and found true all allegations, and the trial court sentenced Calamba as follows:  (1) two consecutive terms of life without the possibility of parole for the murders, plus firearm enhancements of 25 years to life for each murder (§ 12022.53, subd. (d)); and (2) a concurrent term of life for the attempted murder, plus (a) 25 years to life for a firearm enhancement (*ibid.*) and (b) three years for personally inflicting great bodily injury (§ 12022.7, subd. (a)).  Calamba filed a timely notice of appeal.

---

[2]  Undesignated statutory references are to the Penal Code.

[3]  If the evidence "is insufficient to sustain a conviction" for any offense charged in an accusatory pleading, the trial court may enter a judgment of acquittal on the offense "on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision."  (§ 1118.1.)

DISCUSSION

I

*Jury Instructions on the Mental State for Lying-in-Wait First Degree Murder*

Calamba contends there were prejudicial errors in the trial court's instructions to the jury on the mental state required for first degree murder by means of lying in wait. Specifically, he contends the instructions violated his constitutional rights[4] by failing to require a finding that he acted with the pertinent mental state (wanton and reckless intent to inflict injury likely to cause death) when he waited near Valeria's house for about 20 minutes before he killed Valeria and Jesus. We conclude any such instructional error was harmless because the jury heard strong evidence that Calamba was guilty of first degree murder under a theory of deliberation and premeditation and the defense theory on the issue was implausible and relied on contradictory testimony.

A. *Additional Background*

1. *Calamba's Testimony*

Testifying in his own defense, Calamba told the jury that he went to Valeria's house that night because he was contemplating suicide and she was the only person who could talk him out of it. Calamba insisted that (1) he decided to drive to Valeria's house *after* he got in his car and began driving that night and (2) despite the two apparent suicide letters he wrote to his family, he was *not* sure that he would not return home that night, because "if things turned out how they played in [his] head" he might have returned home. He explained that if Valeria "heard [his] side of the story and listened,

---

[4] Though he does not specify which constitutional right he believes was violated, Calamba's cited authority indicates it was the Sixth Amendment. (See *People v. Merritt* (2017) 2 Cal.5th 819, 824 [the Sixth Amendment imposes on trial courts a sua sponte duty to instruct the jury on the essential elements of the charged offense].)

like, gave [him] the time of day . . . [he] would have felt like everything would have been alright."

At first, he testified that he parked his car relatively far from Valeria's house because he did not want her family to wake up and see him outside their home, since he was not welcome there. But he later testified that he "passed by [Valeria's] house looking for parking," and had to park elsewhere because there were no available spaces. He explained that he stepped into the road when he saw Valeria's car approaching, and though he was hoping to stop her before her parents heard the car in the driveway, she accelerated when she saw him. Her car got so close to him on its way to her driveway that he had to push himself away from it by placing his hands on the hood.

Certain that the near miss was not an accident, Calamba banged on the window of the car as Valeria honked the horn in the driveway. He recalled saying to her something like: "You got some nerve hitting me with your car." His mind was racing. He remembered thinking, "I come here to talk to you and this is how you treat me?" "At this point in time this is just me on a rant, like, waving a gun around. Like, I didn't even -- I was talking with my hands, so the gun was in my hand and I'm just -- I don't really remember much of what I was saying." Calamba insisted that while he was considering shooting himself at that moment, he was not thinking about shooting Valeria, because though he was "in a rage" after the car incident, he "knew better than" to shoot her.

Calamba later testified on direct examination that he first brandished his gun *after* Jesus began to charge at him and because he feared Jesus would "tackle[]" him "and that would have been that." When the prosecutor reminded him on cross-examination that his initial testimony was that he waved his gun around in his hand when he ranted at Valeria for nearly striking him with her car, he explained he had been confused: "I thought we were talking about after I shot her brother." Calamba insisted the prosecutor "got the sequence mixed up. There was no gun until [Jesus] came out." The prosecutor asked:

6

"So the gun was in your Nike bag?  Where was it?"  Calamba replied:  "Nike bag, my waistband, somewhere.  It wasn't out."

Calamba told the jury he expected and hoped Jesus would "stand down" after he brandished his gun and backpedaled into the street.  But Jesus kept coming, so he "backpeda[]led even further into the street to give [Jesus] . . . the benefit of the doubt . . . if he seen the gun. . . .  And then at this point . . . we're face-to-face and I fired once.  He doesn't drop or take a knee.  Then I panicked, and I ended up spamming the trigger."

Calamba turned his attention back to Valeria.  He "blamed her for her brother, like, You know I'm going down for this, right?  We could have kept this between us two."  According to Calamba, a "cat fight" ensued.  Valeria "was throwing her arms" at Calamba, who tried to defend himself with one hand, because his other hand "was occupied with the weapon."  He explained:  "I have the gun in my hand, and then I'm thinking, like, three possibilities of tucking the gun back in my waistband or something, but I'm thinking the gun barrel is hot.  I'm thinking of putting the gun on the roof of the car, but I'm thinking somebody is going to sneak up behind me.  And then . . . the only possible . . . reasonable thought . . . I had at the time was just of me being in control of the weapon.  And then I'm assuming that when they said . . . I got tackled, I think that's when I just fired my weapon" at Valeria.[5]  Seeing Valeria dead "broke" Calamba.  "So [he] just sat down next to her and . . . shot [him]self in the chest."

On cross-examination, Calamba insisted he did not remember sending the following threatening text messages to Valeria around two months before he shot her:  "I'ma kill this bitch"; "I'ma kill you quick [of course] don't want shawty to suffer"; "Do 25 to life because of you."  Calamba ultimately conceded to the prosecutor:  "I guess I did" and "I really don't remember, but" I sent the texts "if you're telling me I did."

---

[5]  A police officer who responded to the scene testified that Rojas told him Valeria tackled Calamba after Jesus was shot and before Rojas ran into the house.

Calamba admitted he sent the texts at a time when he was very jealous and thought Valeria was in a romantic relationship with someone else. The prosecutor asked, "Because if you couldn't have her, no one could, right?" Calamba answered, "That was the mindset I was in." The prosecutor asked, "She was all yours and only yours; that's your mindset?" Calamba replied, "Yes."

Regarding gaps in his memory of that night, Calamba provided more details on cross-examination. Concerning Rojas's gunshot wound, he testified: "The first shot that fired was the warning shot, so [Rojas] got the point by then so he turned and fled. When I fired my weapon, those had to be one of the stray bullets that hit him." The prosecutor asked: "So are you telling us now that you distinctly remember the order in which you fired each bullet each time?" Calamba replied, "I remember the first shot I fired. After that it's all hazy because I spammed the trigger, like I said." Regarding Valeria, he agreed with the prosecutor that he shot her at least once when she was inside the car, and insisted he did not remember when she left the car, explaining: "This is where I don't remember. I black out." The prosecutor pressed Calamba to try to explain forensic evidence indicating Valeria was shot from above when she was on the ground. Calamba answered: "I looked down. She's on the ground. I could tell you this, that I didn't shoot her on the ground, if that's what you're trying to imply, because I wasn't even orientated that way."

### 2. *Argument to the Jury*

#### a. *Prosecution Argument*

The prosecutor addressed the jury: Dressed "like an assassin," Calamba waited by Valeria's house and "sprung his ambush" when she arrived around 3:00 a.m. "He had something that he wanted Valeria to hear and she was going to hear it before he killed her and killed himself." The prosecutor continued, "I don't think" Calamba "went there . . . to kill Jesus." "He went there to kill Valeria, because if he couldn't have her, no one could. But he was also willing to do whatever it took to do what he wanted to do, which

8

includes . . . killing anybody, murdering anybody, that tried to stop him. That's what happened to Jesus."

Regarding first degree murder under the theory of premeditation and deliberation, the prosecutor argued that Calamba's plan that night "was based on his text messages from several months before: 'I'm going to kill you. I'm going to do it quick, because I don't want shawty to suffer. . . .' We know he was jealous. We know he was obsessed."

The prosecutor further attacked Calamba's credibility, reminding the jury that Calamba had changed his testimony about the moment he brandished his gun. He also argued that although Calamba claimed to recall certain details from that night, he professed an inability to remember the parts "that hurt him": "Do you believe him? I blacked out. I don't know how Valeria got shot four times. On one hand he tells us he remembers everything just like it was yesterday. But when we get to the really good parts, the parts that hurt him: I blacked out. I don't recall. I don't remember."

Anticipating the defense's argument that Calamba acted in self-defense or imperfect self-defense when he shot Jesus, the prosecutor argued Calamba's concern that he was going to be tackled did not amount to a fear of death or great bodily injury, the subjective mindset the law requires.

b.    *Defense Argument*

Defense counsel argued that when Calamba went to Valeria's house to talk to her and "express himself," Jesus "comes charging at him and he backs up. He's not looking to hurt the brother. He backs up. He doesn't stop. Bang, bang, he shoots to stop him. I don't want to hurt him; I just want to stop him. He's this powerless little boy, basically." "And then there's something that goes on, he says the cat fight, and he fires in the car. And then he doesn't remember what happens, and then he shoots himself. I mean, there is--no--it's not much thought there beyond a certain point."

Regarding the murder charges, defense counsel conceded that "Valeria is a tough one, but Jesus is less difficult in terms of it not being a murder." As to Jesus, "maybe

9

[Calamba] should have run away. Maybe he should have taken the beating, if there was going to be one." "But objectively," defense counsel continued, "you can conclude that when Jesus was coming at him and the father was coming out and he's backing off that he reasonably thought that he was going to get hurt." And if he thought he was going to get hurt, "at that moment he had a right to reasonable self-defense." Counsel stressed to the jurors that it was up to them to decide if shooting Jesus was reasonable self-defense. And he explained that "unreasonable self-defense," was "imperfect self-defense, which is voluntary manslaughter." Defense counsel emphasized that Calamba "didn't have to think he was in danger of death when the brother's charging at him to defend himself. He just needed to think that he was in danger of being harmed."

### c. *Prosecution Rebuttal*

In rebuttal, the prosecutor insisted that defense counsel tried to mislead the jury in closing argument by speaking of Calamba's fear that he would be "harmed" by Jesus. The prosecutor insisted: "That is not the law. . . . You have to fear death or great bodily injury. That's not harm."

### B. *Legal Background*

If an error violates a defendant's federal constitutional rights, reversal is required unless the error was harmless beyond a reasonable doubt. (*People v. Hernandez* (2011) 51 Cal.4th 733, 745.) Under *Chapman v. California* (1967) 386 U.S. 18, 24, "we 'ask whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error.' " (*People v. Canizales* (2019) 7 Cal.5th 591, 615.) The harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial. (*People v. Concha* (2010) 182 Cal.App.4th 1072, 1087.)

A harmless error analysis may include consideration of implausible defense testimony and closing argument to the jury. (See *People v. Fayed* (2020) 9 Cal.5th 147,

10

195 [harmless error because of "the overwhelming evidence of defendant's guilt and in light of the discredited, implausible testimony" of defendant's " 'star witness' "]; *People v. Zambrano* (2004) 124 Cal.App.4th 228, 243 [prosecutorial misconduct harmless in light of the defendant's "patently unreasonable" testimony]; *People v. Flores* (2016) 2 Cal.App.5th 855, 881 [provision of a "legally erroneous theory" to the jury was harmless beyond a reasonable doubt in light of the evidence and the closing arguments of counsel].)

C.      *Analysis*

The jury heard strong evidence that Calamba acted with deliberate and premeditated intent to kill when he shot Valeria, Jesus, Rojas, and himself that night. He had threatened to kill Valeria in multiple text messages. He took a loaded gun to her house on a night when he wrote a suicide note to his parents in which he anticipated that they would wonder "why [he] did what [he] did" and assured them he would be "looking over" them "from the other side." He wore black clothing, the hood of his jacket was over his head, and he had a gun loaded with 17 bullets. When Valeria saw Calamba she honked her car horn rapidly, waking her family inside. Rojas heard Valeria crying and telling Calamba "not to do it" in a scared voice. Her mother heard Valeria say, "wait." When Jesus ran outside wearing only shorts, he saw Calamba standing next to Valeria, who sat in the driver's seat of her car. Calamba's initial testimony indicated that the scene Jesus saw when he got outside was an incensed Calamba waving his gun around in his hand and ranting at Valeria. Jesus charged at Calamba who backpedaled toward the street and fired at least four fatal shots at him.

Rojas, who was about seven feet behind Jesus, hid behind a truck when Calamba started shooting. He left his hiding place after about five seconds because he wanted to prevent his wife from coming outside and putting herself in danger. As he ran up the stairs into his home, a bullet struck his ankle. Less than a minute later, Calamba fatally shot Valeria, apologized to her, and then shot himself in the chest.

11

Calamba's defense was implausible and relied on contradictory testimony. His theory of shooting Jesus in self-defense or imperfect self-defense was implausible because Jesus was unarmed and Calamba feared only that Jesus would "tackle[]" him "and that would have been that." Contrary to Calamba's argument on appeal, that is not a plausible case for even imperfect self-defense, because no reasonable jury would find a subjective fear of great bodily injury when presented with nothing more than a defendant's testimony that they feared being tackled by someone who was merely running at them.[6]

His testimony and theory at trial (and on appeal) that he only wanted to talk to Valeria and might have returned home that night was implausible given the suicide notes he wrote to his family before he departed. And as the prosecutor suggested in closing argument, his testimony that he remembered only the first shot he fired that night because everything was "hazy" after that moment, when he blacked out, was implausible given his testimony that he was certain he did not shoot Valeria when she was on the ground.

His testimony was contradictory on the questions why he parked a few streets away from Valeria's house and when he brandished his gun. Calamba first testified that he parked his car away from Valeria's house because he did not want her family to wake up and see him there, but later testified he looked for parking when he drove by Valeria's home and parked elsewhere because he found no available space there. He initially testified that he brandished his gun when he approached Valeria in her driveway after she

---

[6] Calamba contends in his opening brief that "the anticipated tackle would not be a mere take down, but a forcible body slam" by a "blitzing linebacker . . . looking to pile-drive the quarterback," and it " 'would be rational to conclude' " that such an event presented a substantial danger of serious head injury. This is speculation about what he might have thought when Jesus charged at him. But, again, his *testimony* was simply that he feared Jesus would "tackle[]" him "and that would have been that."

nearly struck him with her car, but later insisted he first brandished his gun when Jesus charged at him.

Given the strong evidence of premeditation and deliberation, the implausible and contradictory nature of Calamba's testimony and defense, and the jury's rejection of his implausible self-defense claim when it found beyond a reasonable doubt he did not have even an unreasonable belief in the need for self-defense, we conclude it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the alleged instructional error. In other words, it is clear beyond a reasonable doubt that a rational jury would have found Calamba guilty of first degree murder (on a theory of premeditation and deliberation) even without any instructional error regarding the mental state for lying-in-wait first degree murder. (See *People v. Fayed*, *supra*, 9 Cal.5th at p. 195; *People v. Flores*, *supra*, 2 Cal.App.5th at p. 881; *People v. Salas* (2006) 37 Cal.4th 967, 983-984 ["no reasonable jury would believe [the defendant's] testimony" given the prosecution's evidence; thus, the "failure to instruct on guilty knowledge was harmless" under *Chapman*]; *People v. Garcia* (2001) 25 Cal.4th 744, 755 [error was harmless beyond a reasonable doubt where "the prosecution presented strong evidence" of the defendant's guilt, and the jury's verdict showed that it "discredited" the defendant's testimony, which was the only evidence supporting the defendant's theory of the case]; *Wright v. West* (1992) 505 U.S. 277, 296 ["if the jury did disbelieve" a criminal defendant, "it was further entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt"]; *Hanrahan v. Thieret* (7th Cir. 1991) 933 F.2d 1328, 1340 ["The less believable the defense . . . the more likely the conclusion that the constitutional error did not contribute to the conviction"]; *Phelps v. Duckworth* (7th Cir. 1985) 772 F.2d 1410, 1413-1414 (en banc) ["implausible or highly contradictory testimony offered by the accused" does not preclude a finding of harmless error].)

## II

*Sufficiency of the Evidence for the Attempted Murder Conviction*

Calamba contends there was insufficient evidence for the jury's finding that he intended to kill Rojas and that such intent was premeditated. He argues Rojas's gunshot wound on his foot does not evince Calamba's intent to kill. We agree with the People that the jury's findings were reasonable, because evidence indicated that Calamba (1) fired multiple shots at a (2) fleeing Rojas (3) following a pause of at least five seconds after he fatally shot Jesus.

A.    *Additional Background*

For this issue, it is sufficient to note that Calamba testified he did not fire shots at Rojas after he fatally shot Jesus. Instead, he maintained the bullet that struck Rojas in the foot came from the first volley of shots that were intended for Jesus.

B.    *Legal Background*

1.    *Standard of Review*

Our limited role in reviewing a challenge to the sufficiency of evidence is to examine the entire record to assess "whether *any* rational trier of fact" could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) We review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. (*Ibid*.) Conflicts in the evidence do not justify reversal of a judgment, for it is the exclusive province of the trier of fact to determine the credibility of a witness and the facts upon which a determination rests. A reversal for insufficient evidence is unwarranted unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the jury's verdict. Substantial evidence is evidence that is "reasonable, credible, and of solid value." (*Ibid*.)

"That the evidence might lead to a different verdict does not warrant a conclusion that the evidence supporting the verdict is insubstantial." (*People v. Holt* (1997) 15 Cal.4th 619, 669.) Thus, even if a reasonable jury *could have* found the evidence did not support premeditation and deliberation, a finding of premeditation and deliberation must stand when circumstances justify it. (*People v. Salazar* (2016) 63 Cal.4th 214, 245.) Further, there is rarely direct evidence of a defendant's intent to kill, which is usually inferred from all the circumstances of the attempt, including the defendant's actions. (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

2. *Intent to Kill and Premeditation and Deliberation*

A conviction for attempted murder requires proof that the defendant intended to kill the victim and proof of a direct but ineffectual act toward accomplishing that goal. (*People v. Medina* (2019) 33 Cal.App.5th 146, 153.) But a finding of willfulness, deliberation, and premeditation requires more than a showing of an intent to kill. (*People v. Gomez* (2018) 6 Cal.5th 243, 282 (*Gomez*).) Evidence of planning, motive, and the manner of killing may show deliberation and premeditation. The question is not the duration of time as much as it is the extent of the reflection and a calculated judgment may be made quickly. (*Ibid.*)

C. *Analysis*

Here, there is evidence that at least five seconds after he stopped shooting Jesus, Calamba opened fire again, firing two shots at Rojas, whose back was to Calamba as he ran to his front door. This scenario presents substantial evidence of a premeditated and deliberate intent to kill.

Intent to kill can be inferred from Calamba's act of purposefully firing a gun at Rojas at close range, without legal excuse.[7] (*People v. Smith*, *supra*, 37 Cal.4th at

---

[7] Calamba does not dispute the evidence indicates he was in close range to Rojas when he shot him and does not contend that he had any legal excuse for shooting him.

p. 742.) And contrary to Calamba's argument, that the bullet struck Rojas's foot, not a vital organ, is not dispositive. (*Ibid.* ["Nor is the circumstance that the bullet misses its mark or fails to prove lethal dispositive—the very act of firing a weapon ' "in a manner that could have inflicted a mortal wound had the bullet been on target" ' is sufficient to support an inference of intent to kill"].)

Further, we agree with the People that the jury reasonably could have concluded Calamba was lying when he insisted Rojas was wounded by a stray bullet intended for Jesus. Rojas's testimony indicated that Calamba fired shots at him at least five seconds after he stopped shooting Jesus. Consistent with the trial court's instruction to the jury regarding a witness who deliberately lies about something significant in the case, a determination by the jury that Calamba lied about targeting Rojas would permit another determination: that Calamba lied about the sequence of events to conceal his intent to kill Rojas. (See *People v. Zamudio*, *supra*, 43 Cal.4th at p. 357 [appellate courts presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence; "it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"]; cf. *Wright v. West*, *supra*, 505 U.S. at p. 296 ["if the jury did disbelieve" a criminal defendant, "it was further entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt"].)

As for premeditation and deliberation, the five-second pause between the shootings gave Calamba a chance to reflect. He had fatally shot Jesus, and Rojas was hiding behind a vehicle. He could have decided to end the violence at that moment. Instead, he opened fire again. This is evidence of planning. (See *People v. San Nicolas* (2004) 34 Cal.4th 614, 658 [the brief moment when the defendant saw the victim's reflection in the mirror before turning around and stabbing her was evidence of "planning," because the "act of planning—involving deliberation and premeditation—requires nothing more than a 'successive thought[] of the mind' "].) The manner of the

16

shooting also reflects deliberation and premeditation, because Calamba fired multiple shots at a fleeing victim, not a single shot during a direct confrontation.  (See *People v. Boyd* (1985) 38 Cal.3d 762, 769-770 [rejecting the defendant's contention that the evidence was insufficient to justify an instruction on premeditated murder, in part because of "the deliberate manner in which defendant acted, especially in firing . . . additional shots at the fleeing . . . victim"]; *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102 [that the victim was "retreating and posing no threats," supported the conclusion the defendant's attack was "deliberately and reflectively conceived"].)  The pause between shootings, the multiple shots fired at Rojas during the second shooting, and the fact that Rojas was retreating all suggest premeditation and deliberation.

Accordingly, there was sufficient evidence to support the jury's finding that Calamba committed premeditated attempted murder.

### III

### *The Attempted Murder Verdict Form*

Observing that attempted murder is not divided into degrees in California, Calamba argues the verdict form that the jury foreperson signed incorrectly characterized the offense in count 3 as attempted *first degree* murder and insists this mistake is prejudicial error.  The People argue the claim is forfeited on appeal and unpersuasive on the merits.  Regarding forfeiture, the People contend Calamba could have raised this claim when the trial court proposed the verdict form and/or when the jury returned the verdict.  Calamba responds that a challenge to a "nonexistent crime" is not subject to the forfeiture rule.

Though there is no crime of "attempted first degree murder" in California, there is nothing remarkable about the notion of an attempted murder that is *committed with premeditation and deliberation*—a mental state for first degree murder.  (See § 189, subd. (a) ["All murder that is perpetrated by . . . any other kind of willful, deliberate, and premeditated killing . . . is murder of the first degree"].)  Indeed, section 664, subdivision

17

(a) explicitly contemplates this phenomenon. Accordingly, we reject Calamba's argument that this claim is not subject to the forfeiture rule.

A. *Legal Background*

1. *Attempted Murder and Section 664*

Though attempted murder is not divided into different degrees, the second sentence of section 664 mandates a specific and greater punishment for an attempted murder that is premeditated. (*People v. Favor* (2012) 54 Cal.4th 868, 876-877; *People v. Solis* (2015) 232 Cal.App.4th 1108, 1113, fn. 2; see § 664, subd. (a) ["if the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole"].)[8]

2. *Errors in a Verdict Form and Forfeiture*

A criminal defendant can clarify a misunderstanding concerning a jury's verdict in the trial court. (*People v. Johnson* (2015) 61 Cal.4th 734, 784.) Therefore, a failure to object to the form of the verdict when the jury returns its finding forfeits an appellate claim of technical error in the form. (*Ibid.* [permitting such a claim to be raised for the first time on appeal would improperly encourage a criminal defendant "not to complain about the verdict form in the trial court in order to secure the advantage of seeking a complete reversal"].)

B. *Analysis*

Calamba contends the forfeiture rule is inapplicable here because the verdict form corresponding to count 3 implicated "a nonexistent crime," rather than a mere ambiguity or technical flaw. He contends *People v. Bean* (1989) 213 Cal.App.3d 639 is authority

---

[8] The first sentence of the statute sets forth the general rule that punishment for attempting to commit a crime is "one-half the term of imprisonment prescribed upon a conviction of the offense attempted." (§ 664, subd. (a).)

18

for the propositions that the trial court had no jurisdiction to enter a judgment of conviction on count 3 and we therefore must adjudicate this claim.  We disagree.

In *Bean*, after the defendant pled guilty to attempted petty theft with a prior conviction, a panel of this court ruled that he pled guilty to a " 'non-crime,' " because in essence, it is impossible to *attempt* to commit a crime that has a prior conviction as an element.  (*People v. Bean*, *supra*, 213 Cal.App.3d at pp. 641-643; *id*. at p. 642, fn. 4 ["One cannot 'attempt' to have been convicted of an offense"].)  The court therefore reversed the conviction as invalid.  (*Id.* at pp. 641, 647.)

But here, as explained above in our discussion of his first claim, it was not impossible for Calamba to deliberate before he tried to kill Rojas, and on this point *People v. Robins* (2020) 44 Cal.App.5th 413 is instructive.  There, the court acknowledged *Bean* and other decisions that illuminate the logical contradictions inherent in the concept of certain offenses, including "attempted involuntary manslaughter," and distinguished those cases from the offense at issue.  (*Robins*, at pp. 418-421; *id*. at p. 420 [determining there was "nothing logically incoherent about the idea of" the crime of conviction at issue in the case].)  Likewise here, there is nothing logically incoherent about the idea of an attempted murder that is committed with premeditation and deliberation.  (See § 664, subd. (a).)  Thus, we reject Calamba's proposed "nonexistent crime" exception to the forfeiture rule.  By failing to object to the form of the verdict in the trial court, Calamba forfeited his appellate claim.

IV

*Evidentiary Challenge to the Lying-in-Wait Special Circumstance Findings*

Calamba contends there was insufficient evidence for the jury's findings that he intentionally killed Valeria and Jesus "by means of lying in wait" (§ 190.2, subd. (a)(15)), in part because of statements made by the prosecutor in opposing a motion for a judgment of acquittal (§ 1118.1).  The People disagree.  But there is a threshold problem with Calamba's argument:  Calamba insists that we cannot consider his trial testimony

when analyzing the merits of this claim.  This misunderstanding of his appellate burden leads Calamba to ignore evidence that may support the jury's verdict and that is fatal to his claim.

### A. *Legal Background*

#### 1. *Lying in Wait*

The " ' "lying-in-wait special circumstance requires ' " 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) . . . a surprise attack on an unsuspecting victim from a position of advantage.' " ' " ' " (*People v. Parker* (2022) 13 Cal.5th 1, 58.)  The lying-in-wait special circumstance includes the elements of first degree lying-in-wait murder, " 'but requires the additional element that the killing was intentional, not merely committed with implied malice.' " (*Ibid.*)  If substantial evidence supports the special circumstance, it necessarily supports the theory of first degree lying-in-wait murder.  (*Ibid.*)

#### 2. *Appellant's Burden*

To bring a successful appellate challenge to the sufficiency of the evidence, a defendant "must set forth in his opening brief *all* of the material evidence on the disputed elements of the crime in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict.  [Citation.]  If the defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the jury's verdict may lie in the evidence he ignores." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574.)

#### 3. *Impact of an Unsuccessful Motion for Judgment of Acquittal*

When reviewing a claim the trial court erred in denying a motion for a judgment of acquittal (§ 1118.1) that was made at the close of the prosecution's case-in-chief, the appellate court considers the evidence "as it stood at that point." (*People v. Cole* (2004)

33 Cal.4th 1158, 1212-1213; see *id*. at p. 1213 ["Where the section 1118.1 motion is made at the close of the prosecution's case-in-chief, the sufficiency of the evidence is tested as it stood at that point"].)

B.     *Analysis*

Acknowledging that he moved for a judgment of acquittal at the close of *his* defense evidence, Calamba nevertheless maintains that we cannot consider his trial testimony but must limit our review to the evidence that the prosecution presented in their case-in-chief.  We disagree.

First, Calamba's claim is that there is insufficient evidence for the jury's lying-in-wait findings, not that the trial court erred in denying his section 1118.1 motion.  Second, even if he were challenging the ruling on his section 1118.1 motion on appeal, *Cole* stands for the proposition that we should limit our review to the prosecution's evidence only if Calamba had moved for a judgment of acquittal *at the close of the prosecution's case-in-chief.*  (*People v. Cole*, *supra*, 33 Cal.4th at pp. 1212-1213.)  Notably, much of the evidence regarding what transpired before Valeria's family was awakened by rapid honking comes from testimony that Calamba provided during the defense case-in-chief, including his contradictory testimony regarding why he parked several streets away from Valeria's home and his implausible testimony that he only wanted to talk to Valeria and might have returned home that night.  (See *Wright v. West*, *supra*, 505 U.S. at p. 296 ["if the jury did disbelieve" a criminal defendant, "it was further entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt"].)

We reject any suggestion by Calamba that he moved for a judgment of acquittal at the close of the prosecution's case-in-chief, because such a suggestion is not supported by adequate citation to the record.  (*People v. Dauterman* (2024) 104 Cal.App.5th 603, 609 ["it is the appellant's burden to demonstrate" error "based on the appellate record and with meaningful legal analysis"].)  The page in the record that Calamba cites for this suggestion indicates no such thing.  We also reject any suggestion by Calamba that the

21

prosecutor's statement that the trial court should ignore defense evidence when considering the section 1118.1 motion has any bearing on our analysis of this issue. A prosecutor's apparent misunderstanding at trial does not bind an appellate court's review of the sufficiency of the evidence supporting a factual finding. (See *Tun v. Wells Fargo Dealer Services, Inc.* (2016) 5 Cal.App.5th 309, 327 ["we are not bound to follow the meaning of a statute (or the law) conceded by a party"].) Having taken the incorrect position that we cannot consider his trial testimony, Calamba has failed to carry his burden to show there was insufficient evidence for the jury's lying-in-wait findings, because support for the jury's findings "may lie in the evidence he ignores." (*People v. Sanghera*, *supra*, 139 Cal.App.4th at p. 1574.) Accordingly, we reject this claim.

V

*Sufficiency of the Evidence of the First Degree Murder of Jesus*

Calamba contends there was insufficient evidence for the jury's finding that when he killed Jesus, he committed first degree murder under either of the two theories advanced by the prosecution at his trial—(1) by lying in wait and (2) with premeditation and deliberation. We conclude there was substantial evidence he committed first degree murder under the theory of premeditation and deliberation. Therefore, we need not address whether evidence supports a theory of murder by lying in wait.**9**

---

**9** The parties agree that if there was sufficient evidence to support the lying-in-wait special circumstance, it follows that there was sufficient evidence for lying-in-wait first degree murder. (See *People v. Parker*, *supra*, 13 Cal.5th at p. 58 [the lying-in-wait special circumstance includes the elements of first degree lying-in-wait murder, " 'but requires the additional element that the killing was intentional, not merely committed with implied malice' "].) Though we rejected above Calamba's evidentiary attack on the lying-in-wait special circumstance, we did so on the grounds that he improperly *ignored* evidence the jury had before it. That reasoning is distinct from a conclusion that there was substantial evidence for the special circumstance.

22

A.      *Additional Background*

Calamba admitted during his trial testimony that he purposefully brought his handgun, loaded with 17 rounds, to Valeria's house.  He testified that when Jesus charged, he "backpedal[]ed into the street and then I pulled the gun. . . .  And then [Jesus] still doesn't slow down or anything like I would expect him to.  Like, I didn't say freeze or anything, but I was hoping that . . . he would stand down.  So then I backpedal[]ed even further into the street to give him . . . the benefit of the doubt . . . if he seen the gun.  Like, he probably didn't.  And then at this point . . . we're face-to-face, and I fired once.  He doesn't drop or take a knee.  Then I panicked, and I ended up spamming the trigger."  Calamba later clarified that "spamming" means to do something multiple times.

B.      *Legal Background*

The unlawful killing of a human being with malice aforethought is murder. (§ 187, subd. (a).)  The Legislature has divided murder into two degrees:  first or second. (See § 189, subds. (a)-(b).)  According to the statutes defining murder, murder is in the first degree if done "by means of a destructive device or explosive, . . . lying in wait, . . . or by any other kind of willful, deliberate, and premeditated killing."  (§ 189, subd. (a).) All other kinds of murders are of the second degree.  (§ 189, subd. (b).)

A murder verdict based on a finding of willfulness, deliberation, and premeditation requires more than a showing that the defendant had an intent to kill. (*Gomez*, *supra*, 6 Cal.5th at p. 282.)  In the context of first degree murder, "premeditated" means considered beforehand, and "deliberate" means formed as a result of careful thought and weighing of considerations for and against the course of action.  (*People v. Smith* (2018) 4 Cal.5th 1134, 1164.)  An extended period is not required for a finding of premeditation and deliberation.  (*Ibid*.)  In *People v. Anderson* (1968) 70 Cal.2d 15, our Supreme Court explained that the type of evidence sufficient to sustain a finding of premeditation and deliberation "falls into three basic categories":  (1) planning, (2) motive, and (3) manner of killing.  (*Id*. at pp. 26-27.)  But the *Anderson* factors "are

23

not the exclusive means for establishing premeditation and deliberation." (*People v. Lenart* (2004) 32 Cal.4th 1107, 1127.) And they "need not be present in any particular combination to find substantial evidence of premeditation and deliberation." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

C.    *Analysis*

Here, Calamba brought a loaded firearm with 17 rounds to the scene, twice backed away as Jesus ran at him, and then killed Jesus by firing at least four shots. That is evidence of a solid value upon which a reasonable jury could find he acted with premeditation and deliberation.

Planning was evinced by the act of bringing a loaded firearm. (See *People v. Young* (2005) 34 Cal.4th 1149, 1183 ["the jury could infer that defendant 'considered the possibility of murder in advance' and intended to kill, because he "executed his planned entry into the house with a loaded gun"].) Planning was also evinced by Calamba's testimony that he twice backed away from an advancing Jesus. (See *People v. San Nicolas*, *supra*, 34 Cal.4th at p. 658 [the brief moment when the defendant saw the victim's reflection in the mirror before turning around and stabbing her was evidence of "planning," because the "act of planning—involving deliberation and premeditation— requires nothing more than a 'successive thought[] of the mind' "]; *Gomez*, *supra*, 6 Cal.5th at p. 282 [a calculated judgment may be made quickly].)

Further, Calamba firing at least four shots at Jesus ("spamming," in Calamba's telling) is "manner" evidence of a premeditated and deliberate killing. (Cf. *People v. Brady* (2010) 50 Cal.4th 547, 564 [the evidence indicated the defendant "wanted to make certain" his victim died, because he "did not merely fire one shot . . . and then flee; rather, he" fired multiple shots and did not flee].) Accordingly, we reject this claim.

24

## VI

### *The Lying-in-Wait Jury Instructions*

Calamba argues the standard instructions the trial court gave to the jury regarding lying-in-wait murder misstated the People's burden of proof and misled the jury, because they described murder "while" lying in wait, rather than murder "by means of" lying in wait, as sections 189, subdivision (a) (first degree murder) and 190.2, subdivision (a)(15) (the special circumstance) describe it. The People argue this claim is forfeited on appeal because the instructions were correct statements of law and Calamba did not seek to modify them in the trial court. We agree with the People. The instructions were correct statements of law and to the extent Calamba argues they should have been modified, such argument is forfeited because it was not raised below. (*People v. Richardson* (2008) 43 Cal.4th 959, 1022-1023.)

Before the voters passed Proposition 18 in 2000 to change the language defining the lying-in-wait special circumstance to conform to the language defining lying-in-wait first degree murder, case law identified a stricter "immediacy requirement" in the special circumstance, which worded the phenomenon as murder "*while*" lying in wait, in contrast to first degree murder "*by means of*" lying in wait. (*People v. Superior Court (Bradway)* (2003) 105 Cal.App.4th 297, 306-307 (*Bradway*) [discussing *Domino v. Superior Court* (1982) 129 Cal.App.3d 1000].) With Proposition 18, the voters "essentially eliminate[d]" the special circumstance's stricter requirement by utilizing the murder statute's "by means of" wording. (*Bradway*, at pp. 306-307.)

Calamba offers the creative argument that by making this textual change to the special circumstance statute, voters "shifted the focus" of *both* the special circumstance and first degree murder "away from the temporal . . . to the facilitative." He further argues the instructions his jury received misstated this "facilitative" dimension of lying-in-wait murder. This argument is forfeited on appeal, however, because it was not raised below, Calamba cites no authority in support, and it is inconsistent with *Bradway*'s

25

discussion of the concerns that animated passage of Proposition 18:  (1) temporality and (2) changing the wording of the special circumstance to conform to the definition of first degree murder.  (See *People v. Richardson*, *supra*, 43 Cal.4th at pp. 1022-1023 [finding forfeited a defendant's challenge to a jury instruction where no supporting authority was cited, the instruction was a correct statement of the law, and "[i]nsofar as defendant contend[ed]" the instruction "should have been modified," he failed to seek such modification in the trial court].)

In fact, there is no indication that shifting the focus of *both* first degree murder and the special circumstance was a concern that animated passage of the law.  In *Bradway*, the court explained that the Legislative Analyst's analysis of Proposition 18 in the ballot pamphlet stated that the proposed change (1) " 'would permit the finding of a special circumstance not only in a case in which a murder occurred *immediately* upon a confrontation between the murderer and the victim, but also in a case in which the murderer waited for the victim, captured the victim, transported the victim to another location, and *then* committed the murder' " and (2) would " 'replace[] the current language establishing a special circumstance for murders committed 'while lying in wait.' " (*Bradway*, *supra*, 105 Cal.App.4th at pp. 307-308, italics added.)[10]

## VII

### *Unanimity on the Degree of Murder and CALCRIM No. 521*

Calamba argues his constitutional right to a unanimous jury verdict was violated when the trial court instructed the jury with CALCRIM No. 521, which he contends allows a defendant to be convicted of first degree murder without unanimity as to degree.

---

[10]  To the extent the jury instructions describing murder "while lying in wait" misstated the People's burden at all, the misstatement arguably inured to Calamba's benefit given the case law that murder "while" lying in wait contemplates a stricter temporal nexus than murder "by means of" lying in wait. (*Bradway*, *supra*, 105 Cal.App.4th at pp. 306-307.)

The People argue the claim is both forfeited on appeal because Calamba did not raise it below and unpersuasive on the merits. We reject the claim on the merits because the instruction was not reasonably likely to be understood by the jury as Calamba asserts.

A.      *Additional Background*

Consistent with CALCRIM No. 521, the trial court instructed the jury: "You may not find the defendant guilty of first degree murder unless all of you agree that the People have proved that the defendant committed murder, but all of you do not need to agree on the same theory." Calamba acknowledges the trial court also instructed the jury with CALCRIM No. 520, when it said: "If you decide that the defendant committed murder, it is murder of the second degree unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. 521." As explained above, the trial court also instructed the jury regarding applicable theories of first degree murder, second degree murder, voluntary manslaughter, and the defense of reasonable self-defense.

In closing argument, the prosecution urged the jury to find Calamba guilty of *first* degree murder, insisting Calamba was guilty under both the theories of lying in wait and premeditation and deliberation. Articulating the test for second degree murder while implicitly disclaiming any effort to advocate for a finding of guilt on that offense, the prosecutor told the jury: "A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. [¶] This doesn't apply here. There's nothing impulsive about what [Calamba] did to Valeria. Nothing impulsive about what [Calamba] did to Jesus. It wasn't made rashly. He took those extra rounds so he could kill anybody that stopped him" from trying to kill Valeria.

Defense counsel argued that the deaths of Valeria and Jesus were *not murders at all*. Regarding Jesus, he urged the jury to focus on the question whether Calamba acted in reasonable self-defense (which would support a not guilty verdict) or imperfect self-defense (which would support a verdict of voluntary manslaughter). (*People v. Moye*

27

(2009) 47 Cal.4th 537, 554.)  Regarding Valeria, he urged the jury to find voluntary manslaughter, because Calamba shot her "without thinking" as they struggled on the ground.

B.    *Analysis*

"A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant."  (*People v. Cross* (2008) 45 Cal.4th 58, 67-68.)  To determine whether there is a reasonable likelihood the jury misconstrued or misapplied the law, we must consider the jury instructions as a whole, the entire record of the trial, and the arguments of counsel.  (*People v. Carrington* (2009) 47 Cal.4th 145, 192.)  We review de novo.  (*People v. Shaw* (2002) 97 Cal.App.4th 833, 838.)

Calamba has not demonstrated a reasonable likelihood that the jury understood the instruction in the way he asserts,[11] because no one argued for a conviction of second degree murder.  Though the jurors were instructed on second degree murder, the prosecutor urged them to find Calamba guilty of first degree murder and defense counsel urged them to find Calamba either not guilty or guilty of voluntary manslaughter.  Calamba cites nothing in the record that reflects the jury gave any indication it was confused by the unanimity instructions or the differences between first and second degree murder.  Based on the entire record of this trial, including the jury instructions and argument of counsel, Calamba has not carried his burden to persuade us that there is a reasonable likelihood the jury would have misconstrued the instructions in the manner he suggests.  In other words, there is no reasonable likelihood that the jurors did not unanimously agree Calamba was guilty of murder in the first degree.

---

[11]  Nor has he identified in his opening brief the applicable legal framework for this claim.

28

## VIII

### *Jury Instructions on Imperfect Self-defense*

Calamba argues the trial court erroneously instructed the jury that imperfect self-defense does not apply when a defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force, because (1) there was no substantial evidence for the instruction and (2) it was worded in a way that misstated the law or created a reasonable likelihood that the jury would misunderstand it and misapply it, because "the right to assert imperfect self defense is not lost by mere 'wrongful' conduct, it is lost by engaging in *illegal* conduct that *legally* justifies an adversary's use of force."

We reject this claim because the jury's finding of guilt on first degree murder was an implicit rejection of Calamba's version of events, leaving no doubt it would have returned the same verdict had it been instructed regarding imperfect self-defense in the way that Calamba urges. This is so because, had the jury believed Calamba killed Jesus without premeditation and deliberation and/or by means of not lying in wait, it would not have found Calamba guilty of first degree murder, but instead of second degree murder. Having not done so, the jury implicitly rejected the theory that Calamba killed Jesus spontaneously out of fear and therefore would have reached the same result even with the imperfect self-defense instruction Calamba urges. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 582 ["The jury's verdict finding defendant guilty of the first degree murder . . . implicitly rejected defendant's version of the events, leaving no doubt the jury would have returned the same verdict had it been instructed regarding imperfect self-defense"]; *People v. Lewis* (2001) 25 Cal.4th 610, 646 ["Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions"].)

## IX

*Jury Instruction that "Provocation May Reduce a Murder" to Second Degree*

Calamba contends a standard instruction that the trial court provided to the jury—that provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter—erroneously and prejudicially "reverse[d] the presumption of law" in his case, because the law "makes second degree murder presumptive."

We agree with the People that it is unlikely the jury understood the instruction this way because of other jury instructions and the parties' arguments to the jury. (*People v. Cross*, *supra*, 45 Cal.4th at pp. 67-68 ["A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant"].) Before providing the challenged instruction, the trial court told the jury: "If you decide that the defendant committed murder, it is murder of the second degree unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. 521." And immediately before providing the challenged instruction, the trial court told the jury: "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder." Further, as we explained above, second degree murder was not advocated by either side in closing argument to the jury.

## X

*Errors in the Abstract of Judgment*

The parties agree the abstract of judgment contains four discrete erroneous characterizations of aspects of Calamba's sentence that the trial court imposed. The People urge us to correct those clerical errors under the inherent authority we have, as explained in *People v. Mitchell* (2001) 26 Cal.4th 181. (*Id.* at p. 185 [" 'a court has the inherent power to correct clerical errors in its records so as to make these records reflect

30

the true facts' "].)  The parties agree on the following clerical errors:  (1) the box indicating a concurrent sentence on count 3 should be checked; (2) the sentences of life without parole for the firearm enhancements should be corrected to indicate sentences of 25 years to life; (3) count 3 should be removed from the list of counts receiving a sentence of life without parole; and (4) the sentence for count 3 should be designated as life with the possibility of parole.  We agree with the parties.

We have also identified a mistake the trial court made at sentencing.  For the attempted murder of Rojas (count 3), the trial court should have stayed the three-year enhancement for great bodily injury under section 12022.7 because it also imposed a term of 25 years to life under section 12022.53, subdivision (d), for personally and proximately causing great bodily injury with a firearm.  (§ 12022.53, subd. (f) ["An enhancement for great bodily injury as defined in Section 12022.7, 12022.8, or 12022.9 shall not be imposed on a person in addition to an enhancement imposed pursuant to subdivision (d)" of § 12022.53]; *People v. Garcia* (2017) 7 Cal.App.5th 941, 949 ["Because the court also imposed the 25-year-to-life enhancement under section 12022.53, subdivision (d), for intentionally discharging a firearm with great bodily injury, the court should have stayed the three-year enhancement for great bodily injury under section 12022.7"].)  We will modify the judgment so that it accords with the law. (*People v. Hunter* (1986) 184 Cal.App.3d 1531, 1537 ["Where multiple prison terms are improperly imposed as in this case, the reviewing court may modify the sentence to stay imposition of the sentence"].)

## DISPOSITION

The convictions are affirmed.  We modify the judgment to stay the enhancement for great bodily injury.  The trial court is directed to prepare an amended abstract of judgment reflecting (1) the three-year term of imprisonment in count 3 for the great bodily injury enhancement is stayed, (2) the sentence for count 3 is a concurrent sentence, (3) sentences of 25 years to life were imposed for the firearm enhancements, and (4) the

31

sentence for count 3 is life with the possibility of parole.  A certified copy of the amended abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


                                                  /s/
                                         BOULWARE EURIE, J.


We concur:


     /s/
MAURO, Acting P. J.


     /s/
MESIWALA, J.